## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| JENNIFER YATES, derivatively on behalf of NEXTERA ENERGY, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOHN W. KETCHUM, ERIC SILAGY, JAMES ROBO, DAVID P. REUTER, NICOLE S. ARNABOLDI, SHERRY S. BARRAT, JAMES L. CAMAREN, KENNETH B. DUNN, NAREN GURSAHANEY, KIRK S. HACHIGIAN, AMY B. LANE, DAVID PORGES, JOHN A. STALL, DARRYL L. WILSON, RUDY E. SCHUPP, JOHN L. SKOLDS, and LYNN M. UTTER, <br><br> Defendants, <br><br> And <br><br> NEXTERA ENERGY, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Jennifer Yates ("Plaintiff"), by and through Plaintiff's undersigned counsel, derivatively on behalf of Nominal Defendant NextEra Energy, Inc. ("NextEra" or the "Company"), brings this Verified Shareholder Derivative Complaint against John W. Ketchum ("Ketchum"), Eric Silagy ("Silagy"), James Robo ("Robo"), David P. Reuter ("Reuter"), Nicole S. Arnaboldi ("Arnaboldi"), Sherry S. Barrat ("Barrat"), James L. Camaren ("Camaren"), Kenneth B. Dunn ("Dunn"), Naren Gursahaney ("Gursahaney"), Kirk S. Hachigian ("Hachigian"), Amy B. Lane

("Lane"), David Porges ("Porges"), John A. Stall ("Stall"), Darryl L. Wilson ("Wilson"), Rudy E. Schupp ("Schupp"), John L. Skolds ("Skolds"), and Lynn M. Utter ("Utter") (collectively, the "Individual Defendants" and, together with NextEra, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by NextEra with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, filings in the securities class action captioned *Jastram v. NextEra Energy, Inc., et al.*, Case No. 9:23-cv-80833-CANNON (S.D. Fla.) (the "Securities Class Action"), and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought against certain current and former NextEra officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants.

2.      NextEra holds itself out as the world's largest utility company with more than $17 billion in annual revenues. NextEra serves over 11 million customers in the State of Florida through its subsidiary, Florida Power and Light Co. ("FPL"). At all relevant times, NextEra and the Individual Defendants controlled FPL, including its political activities.

3.      NextEra and its subsidiaries operate in a highly regulated industry, and are dependent on local, state, and federal lawmakers to set the regulatory environment under which

NextEra operates its businesses. As such, NextEra regularly spends significant sums on lobbyists and political consultants to advocate for NextEra's interests.

4.      NextEra's dependence on lawmakers also gives the Company an interest in ensuring that its preferred candidates for office are promoted, and that NextEra's preferred policies are enacted. Operating in this political environment means that the Company is bound by federal, state, and local election laws and regulations. Federal and state laws also prohibit NextEra from using its market position to operate in an anticompetitive fashion. In addition, the Company and its leadership are bound by NextEra's own policies and guidelines on how to operate ethically and legally in that environment. As a publicly traded company, NextEra and its leadership are also bound by SEC rules and regulations, which forbid NextEra from issuing materially false and misleading statements about the Company.

5.      On December 2, 2021, media outlets, including the *Miami Herald*, the *Orlando Sentinel*, and the *Florida Times-Union,* began reporting that FPL and its political consulting firm, Matrix LLC ("Matrix") orchestrated a series of improper political expenditures, including potential violations of state and federal campaign finance laws. Those reports alleged that FPL's political consultants used a network of nonprofits to steer funding towards certain "ghost candidates" intended to derail the campaign efforts of unfriendly legislators seeking reelection to the Florida state legislature during the 2020 election cycle. Those "ghost candidates" did not actually intend to run for office — instead their candidacy was intended to confuse voters and siphon votes from a bona fide candidate to help the opposing candidate party win the election. Subsequent reports also alleged that FPL spied on journalists after the publication of unsupportive reporting and improperly courted public officials — with the express purpose of benefiting FPL and with the

knowing approval of FPL executives. Later reports also tied FPL to "ghost candidates" in the 2018 election cycle.

6.       In response to the above reports, NextEra denied any involvement in any potential scandal. On December 2, 2021, in response to an *Orlando Sentinel* story, Defendant Reuter, who worked as NextEra's corporate spokesperson, stated that "[a]ny report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false."

7.       Likewise, during a conference call with stock market analysts and investors on January 25, 2022, Defendant Robo, who then worked as NextEra's Chief Executive Officer ("CEO") and Board Chairman, stated that NextEra had "conducted a very extensive and thorough investigation that included looking at company financial records. It included looking at everyone who was named in its company e-mails, also looking at their – they've all provided access to their personal e-mails and text to us as part of that investigation. And the bottom line is we found no evidence of any issues at all . . . I feel very good that there is no basis to any of these allegations[.]"

8.       However, approximately one month before the *Miami Herald*, *Orlando Sentinel*, and *Florida-Times Union* reported on alleged wrongdoing by NextEra, Defendant Robo received a FedEx package containing a memorandum linking NextEra, Defendant Silagy, and other NextEra employees to the scandals (the "Robo Memorandum"). The Robo Memorandum is dated November 3, 2021, and is titled "Florida Power & Light Officers' Potential Unlawful Conduct Through Third-Party Consultants and Vendors."[1]

---

[1] *See*, *Jastram v. NextEra Energy, Inc. et al.*, Case No. 9:23-cv-80833 (S.D. Fla.) ECF No. 68.

9.      The Robo Memorandum states that Matrix's own internal investigation "quickly identified the involvement of [FPL] President Eric Silagy . . . vice president for state legislative affairs Daniel Martell, vice president for external affairs and economic development Pam Rauch and NextEra Energy, Inc. vice president for integrated clean energy solution Julie Holmes" as having been "engaged in an ongoing scheme with [former Matrix CEO Jeff] Pitts and others to secretly divert corporate resources to off-the-books communications and political campaigns."

10.     The *Miami Herald*, the *Orlando Sentinel*, and the *Florida Times-Union* each reported that Robo was sent a copy of the Robo Memorandum and, as part of their investigation into this action, plaintiffs in the Security Class Action obtained a copy of the memorandum to support its allegations.

11.     The Robo Memorandum, along with its supporting exhibits and associated documents describe in detail, that: (1) Matrix specifically outlined for FPL executives how it would use a series of 501(c)(4) and other entities controlled by its operatives or affiliates to conceal FPL's political expenditures for the 2020 election cycle; (2) FPL executives, including Defendant Silagy, approved and orchestrated the selection of which elected officials should be the subject of FPL's concealed political expenditures; and (3) FPL funds flowed through a series of intermediaries to dark money groups and vendors responsible for recruiting or bolstering the "ghost candidates" who served as spoilers in the 2020.

12.     By denying any involvement in the Matrix scheme, and by claiming there was no basis for any potential liability, Defendants Robo, Silagy, and Reuter caused NextEra to violate federal securities laws as well as the Company's own policies.

13.     A separate NextEra subsidiary, NextEra Energy Resources, LLC ("NEER"), participated in a similar scheme in Maine at the same time as the FPL-Matrix scheme was

occurring. By steering company funds through a series of 501(c)(4) groups, NextEra sought to influence the progress of a major transmission line called New England Clean Energy Connect ("NECEC"). A Maine elections regulator conducted an investigation, which found wrongdoing by the groups funded by NEER. In addition, NextEra engaged in anticompetitive conduct by seeking to derail NECEC by introducing two unconstitutional referendums, engaging in the dark-money scheme, and obstructing infrastructure improvements. As a result of this misadventure, NextEra is now defending antitrust claims in *Avangrid, Inc. et al. v. NextEra Energy, Inc. et al.*, Case No. 3:24-cv-30141-MGM (D. Mass.) (the "Antitrust Action").

14. The Individual Defendants violated their fiduciary duties to NextEra and its shareholders and violated federal securities laws by orchestrating the FPL-Matrix and NECEC schemes, by allowing NextEra to issue false and misleading statements about the schemes to the market, and by failing to adequately establish and monitor internal controls to prevent, detect, or otherwise properly deal with wrongdoing or wrongdoers.

15. As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Robo, Silagy, and Reuter on May 26, 2023. On September 27, 2024, the Court granted defendants' motion to dismiss in the Securities Class Action. *See* Securities Class Action, ECF No. 118. However, that decision was reversed and remanded by the United States Court of Appeals for the Eleventh Circuit on February 23, 2026. *Id*. ECF No. 123. Thereafter, on March 16, 2026, the parties in the Securities Class Action filed a joint status report indicating that they have reached a settlement agreement. The Securities Class Action and the illegal contribution scheme exposed the Company to enormous expenses, liability, reputational damage, loss of goodwill, and distraction from its business purpose.

6

16.     As a result of the Individual Defendants' breach of fiduciary duty, NextEra and its shareholders suffered financial and reputational harm. NextEra is subject to severe monetary liability from the Securities Class Action and the Antitrust Action. Likewise, the Company's reputation was tarnished as a result of these schemes being exposed by the media. The Individual Defendants were unjustly enriched despite their breaches of duty, and this action seeks to obtain redress for NextEra and its shareholders for the harm they suffered.

17.     This action seeks to obtain relief on behalf of NextEra for the damages it incurred as a result of the Individual Defendants' conduct as well as prospective relief ensuring that the Company's officers and directors remediate the Company's internal control issues relating to political activities and regulatory compliance.

## JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiff's claims asserted herein raise a federal question under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78a *et seq.*, including Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9; Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company's principal executive offices are located in this District, a substantial portion of the

transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

22.     **Plaintiff** is a current shareholder of NextEra and has continuously held NextEra common stock at all relevant times.

23.     **Nominal Defendant NextEra** is incorporated under the laws of the State of Florida, with its principal executive offices located at 700 Universe Boulevard, Juno Beach, Florida. NextEra describes itself as a holding company that conducts its operations mainly through its wholly-owned subsidiaries, FPL, and indirectly through NextEra Energy Capital Holdings, Inc., NextEra Energy Resources, LLC, and NextEra Energy Transmission, LLC (collectively "NEER").

24.     **Defendant Ketchum** has served as NextEra's CEO, President and director since March 2022 and as Chairman of the Board since July 2022. Defendant Ketchum has also served as the Chairman of FPL since February 2023. Defendant Ketchum serves as a member of the Nuclear Committee and as Chair of the Executive Committee. According to the proxy statement filed on Schedule 14A with the SEC on April 1, 2025 (the "2025 Proxy Statement"), in 2024, Defendant Ketchum received $21,603,598 in compensation from the Company.

25.     **Defendant Silagy** retired from NextEra on May 15, 2023. Prior to his retirement, Defendant Silagy served in various roles such as Chairman of FPL, President of FPL, and CEO of FPL. Defendant Silagy was also a named executive officer of NextEra. According to the proxy statement filed on Schedule 14A with the SEC on April 5, 2023 (the "2023 Proxy Statement"), in 2022, Defendant Silagy received $14,021,836 in compensation from the Company.

26.  **Defendant Robo** departed from the Company on April 30, 2022. During the Relevant Period Defendant Robo served as Chairman, President and CEO of NextEra, and as Executive Chairman of the Board. According to the 2023 Proxy Statement, in 2022, Defendant Robo received $40,406,018 in compensation from the Company.

27.  **Defendant Reuter** departed from the Company, but previously worked as NextEra's Vice President and Chief Communications Officer and as the primary corporate spokesperson for NextEra and FPL during the Relevant Period. Due to his position in the Company, Reuter possessed the authority to control the content of the Company's press releases and statements to journalists.

28.  **Defendant Arnaboldi** has served as a Company director since 2022. She currently serves as a member of the Audit Committee and the Finance & Investment Committee. According to the 2025 Proxy Statement, in 2024, Defendant Arnaboldi received $340,555 in compensation from the Company.

29.  **Defendant Barrat** previously served as a Company director from 1998 and as lead director from 2022 until her retirement. According to the proxy statement filed on Schedule 14A with the SEC on April 1, 2024 (the "2024 Proxy Statement") Defendant Barrat retired from the Board on May 23, 2024. According to the 2025 Proxy Statement, in 2024, Defendant Barrat received $278,555 in compensation from the Company.

30.  **Defendant Camaren** has served as a Company director since 2002. Defendant Camaren serves as a member of the Compensation Committee and the Finance & Investment Committee. According to the 2025 Proxy Statement, in 2024, Defendant Camaren received $330,555 in compensation from the Company.

31. **Defendant Dunn** served as a Company director from 2010 to May 23, 2024. Defendant Dunn served as a member of the Audit Committee and the Finance & Investment Committee. According to the 2025 Proxy Statement, in 2024, Defendant Dunn received $258,055 in compensation from the Company.

32. **Defendant Gursahaney** has served as a Company director since 2014. Defendant Gursahaney serves as Chair of the Audit Committee and as a member of the Executive Committee and the Governance & Nominating Committee. According to the 2025 Proxy Statement, in 2024, Defendant Gursahaney received $355,555 in compensation from the Company.

33. **Defendant Hachigian** has served as a Company director since 2013. Defendant Hachigian serves as Chair of the Compensation Committee and as a member of the Executive Committee and the Governance & Nominating Committee. According to the 2025 Proxy Statement, in 2024, Defendant Hachigian received $350,555 in compensation from the Company.

34. **Defendant Lane** has served as a Company director since 2015. Defendant Lane serves as Chair of the Governance & Nominating Committee, and as a member of the Compensation Committee and the Executive Committee. According to the 2025 Proxy Statement, in 2024, Defendant Lane received $380,555 in compensation from the Company.

35. **Defendant Porges** has served as a Company director since 2020. Defendant Porges serves as Chair of the Finance & Investment Committee, and as a member of the Executive Committee and the Governance & Nominating Committee. According to the 2025 Proxy Statement, in 2024, Defendant Porges received $350,555 in compensation from the Company.

36. **Defendant Stall** has served as a Company director since 2022. Defendant Stall serves as a member of the Audit Committee and as Chair of the Nuclear Committee. According to

the 2025 Proxy Statement, in 2024, Defendant Stall received $355,555 in compensation from the Company.

37.     **Defendant Wilson** has served as a Company director since 2018. Defendant Wilson serves as a member of the Audit Committee and the Compensation Committee. According to the 2025 Proxy Statement, in 2024, Defendant Wilson received $330,555 in compensation from the Company.

38.     **Defendant Schupp** served as a Company director from 2005 to May 18, 2023. Defendant Schupp served as a member of the Compensation Committee and the Executive Committee, and as Chair of the Governance & Nominating Committee. According to the 2024 Proxy Statement, in 2023, Defendant Schupp received $267,941 in compensation from the Company.

39.     **Defendant Skolds** served as a Company director from 2012 to May 18, 2023. Defendant Skolds served as a member of the Audit Committee and as Chair of the Nuclear Committee. According to the 2024 Proxy Statement, in 2023, Defendant Skolds received $270,441 in compensation from the Company.

40.     **Defendant Utter** served as a Company director from February 11, 2021 to May 19, 2022. Defendant Utter served as a member of the Finance & Investment Committee and the Audit Committee. According to the 2023 Proxy Statement, in 2022, Defendant Utter received $325,493 in compensation from the Company.

41.     **Non-party Director Geoffrey S. Martha ("Martha")** has served as a member of the Board since 2024. Martha is named herein solely for the purposes of demand futility. Martha serves as a member of the Finance & Investment Committee. Martha participates in the same compensation plans as the other non-employee members of the Board.

11

42. **Non-party Director Deborah L. Stahlkopf ("Stahlkopf")** has served as a member of the Board since 2023. Stahlkopf is named herein solely for the purposes of demand futility. Stahlkopf serves as a member of the Audit Committee and the Compensation Committee. Stahlkopf participates in the same compensation plans as the other non-employee members of the Board.

43. **Non-party Director Maria G. Henry ("Henry")** has served as a member of the Board since 2023. Henry is named herein solely for the purposes of demand futility. Henry serves as a member of the Audit Committee and the Finance & Investment Committee. Henry participates in the same compensation plans as the other non-employee members of the Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

44. By reason of their positions as officers, directors, and/or fiduciaries of NextEra and because of their ability to control the business and corporate affairs of NextEra, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

45. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business

prospects so that the market price of the Company's stock would be based on truthful and accurate information.

46.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

47.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of

13

financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

48. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

49. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

50.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

51.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

52.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of NextEra, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

53.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

54.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of NextEra and at all times acted within the course and scope of such agency.

15

**THE CODE OF BUSINESS CONDUCT & ETHICS**

55.     NextEra maintains a Code of Business Conduct and Ethics (the "Code of Conduct"), which states in relevant part:

Violations of our Code, values, policies or the law may carry serious consequences for the individuals involved, as well as for NextEra Energy as a whole. Individuals engaging in unethical or illegal behavior and those who direct, condone, approve or facilitate such behavior may be subject to disciplinary action, up to and including termination. Such conduct may also result in legal action. Behavior that violates the Code puts all of us at risk of a damaged reputation, negatively affects our stakeholders and may subject us to fines and civil or criminal liability.

56.     In a section titled "Political Participation Process" the Code states, in relevant part:

You must not engage in, or hire third parties to engage in, lobbying activities on behalf of NextEra Energy, without prior consent from the applicable VP according to the table that follows. ***Further, lobbying activities may require disclosure and may be subject to specific rules. It is your responsibility to ensure that you are in compliance with the applicable laws.***

\*\*\*

NextEra Energy funds may not be used to contribute to any political party, committee, candidate, holder of any government position or social welfare organizations, ***unless such contribution is permitted by law*** and complies with Company policies, including receiving internal approvals where required.

(Emphasis added).

57.     The Code further states, in relevant part: "[Y]ou may not hire a third party to do something that you are prohibited from doing under the Code or that you cannot ethically or legally do yourself."

58.     In a section titled "We Communicate Truthfully With the Public" the Code provides, in relevant part:

***Our policy is to communicate truthfully with the public.*** At the same time, we aim to be consistent in our messaging and are careful to promote our Company's best interests. For this reason, only authorized individuals can speak with the media on NextEra Energy's behalf.

(Emphasis added).

59.     Likewise, in a section titled "We Compete with Integrity" the Code states in relevant part:

> We never sacrifice our integrity to win business. This means we comply with all applicable antitrust and competition laws, wherever we do business. While complex, these laws are meant to ensure a level-playing field and fair competition in the marketplace.

## THE AUDIT COMMITTEE CHARTER

60.     The Company also maintains an Audit and Finance Committee Charter (the "Charter"), which states:

> The Audit Committee is appointed by the Board of Directors of NextEra Energy, Inc. (the "Board") to assist the Board in its oversight of: (1) the integrity of the financial statements of the Company; (2) the independent auditor's qualifications and independence; (3) the performance of the Company's internal audit function and independent auditor; (4) the compliance by the Company with legal and regulatory requirements; and (5) the accounting and financial reporting processes of the Company and audits of the financial statements of the Company. In addition, the Committee shall prepare the report required by the rules of the Securities and Exchange Commission (the "Commission") to be included in the Company's annual proxy statement.

61.     In a section titled "Financial Statement and Disclosure Matters", the Charter states that the Audit Committee has the authority and responsibility to do the following, in relevant part:

- Meet to review and discuss with management and the independent auditor the annual audited financial statements of the Company, including reviewing disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), and recommend to the Board whether such audited financial statements should be included in the Company's Form 10-K.

- Meet to review and discuss with management and the independent auditor the Company's quarterly financial statements (including reviewing disclosures made in MD&A).

- Review major issues regarding accounting principles and financial statement presentations, including any significant changes made in the Company's

selection or application of accounting principles and practices, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

- Review and discuss reports from the independent auditor on:

  o Critical accounting policies and practices to be used, as identified to the Committee by the independent auditor.

  o All alternative treatments of financial information within generally accepted accounting principles for policies and practices related to material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

  o Other material written communications between the independent auditor and management, such as any schedule of unadjusted differences and any "management letter" or "internal control letter" issued or proposed to be issued by the independent auditor.

- Review and discuss with management and the independent auditor management's internal control report required to be included in the Company's annual report on Form 10-K, management's assessment of the internal control structure and procedures of the Company for financial reporting, and the independent auditor's 3 opinion on the effectiveness of the Company's internal control over financial reporting.

- Afford the chief financial officer and chief accounting officer open lines of communication to the Committee.

- Discuss with management the earnings releases of the Company, including the use of "pro forma" or "adjusted" non-GAAP information therein, as well as financial information and earnings expectations provided to analysts and rating agencies. This may be done generally through a discussion from time to time (and need not be in advance of each such release or provision of such guidance) of the types of information to be disclosed and the types of presentations to be made.

- Discuss with management and the independent auditor the effect of regulatory and accounting initiatives on the Company's financial statements.

- Discuss with management and the independent auditor the effect of off- balance sheet structures on the Company's financial statements.

- Discuss with management the Company's policies with respect to risk assessment and risk management.

- Review and discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

- Ensure that risks identified from time to time as major risks are reviewed by the Board or a Board Committee.

- Discuss with the independent auditor the matters required to be discussed by Auditing Standard No. 16, as amended or supplemented, relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management, and management's response.

- Review disclosures made to the Committee about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

62.    In a section titled "Oversight of the Company's Internal Audit Function," the Charter requires the Audit Committee to, among other things, "[r]eview the significant reports to management required by the internal auditing department and management's responses."

63.    In a section titled "Compliance Oversight Responsibilities," the Charter requires the Audit Committee to:

- Afford the individual or individuals with operational responsibility for the compliance and ethics program an open line of communication to the Committee, including the authority to communicate to the Committee (1) promptly on any matter involving criminal conduct or potential criminal conduct, and (2) no less than annually on the implementation and effectiveness of the compliance and ethics program.

- Review management reports with respect to the conformity of the Company and its affiliated entities with applicable legal and regulatory requirements. Review compliance with the Company's Code of Business Conduct & Ethics and with the Code of Ethics for Senior Executive and Financial Officers, including review of any violations and waivers of such codes of ethics.

- Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

19

- Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies.

- Discuss with the Company's General Counsel legal matters that the General Counsel believes are reasonably possible to have a material impact on the Company's financial statements, internal controls or compliance policies.

- Discuss with management, at least annually, emerging artificial intelligence developments and the Company's risk oversight with respect to artificial intelligence.

## SUBSTANTIVE ALLEGATIONS

### Background

64.    NextEra is one of the largest energy and utility holding companies in North America. NextEra produced revenue of over $18 billion in 2020 and employs approximately 14,900 employees in the United States and Canada.

65.    FPL delivers rate-regulated electricity to over 10 million people across nearly half of the State of Florida and is considered the largest electric utility company in the United States

66.    NEER is the world's largest producer of renewable wind and solar energy.

67.    NextEra is entirely dependent on FPL and NEER for its corporate revenues. In the most recent Form 10-K jointly filed by NextEra and FPL on February 13, 2026, NextEra earned $27.40 billion in revenue, of which $18.26 billion (66.6%) is attributable to FPL, and $8.76 billion (32%) attributable to NEER.

68.    The three entities share resources and management. For example, Defendant Ketchum serves as NextEra's CEO, President, and Chairman, concurrently serves as FPL's CEO, and previously served as President and CEO of NEER. Likewise, Defendant Robo was NextEra's

Chairman, President, and CEO while also serving as FPL's Chairman, and previously served as President of NEER.

69.     NextEra and its operating subsidiaries do business in a highly regulated environment. FPL is a rate-regulated utility provider and is overseen by several state and federal regulators, including the Florida Public Service Commission ("FPSC"); the U.S. Federal Energy Regulatory Commission ("FERC"); the North American Electric Reliability Corporation ("NERC"), the U.S. Nuclear Regulatory Commission ("NRC"), and the U.S. Environmental Protection Agency ("EPA"). NEER has ownership interests in rate-regulated transmission facilities, which are regulated by state/provincial and federal entities in Texas, California, New York, and Ontario, among others.

70.     Most notably, the FPSC is responsible for much of FPL's operating parameters, including retail rates, service area, issuance of securities, and planning, siting, and construction of facilities.

71.     FPSC has five commissioners, which are appointed by the Governor of Florida, and confirmed by the Florida Senate.

72.     Since NextEra is highly dependent on decisions made by politically appointed regulators like the FPSC, it is no surprise that NextEra spends significant sums of money on lobbying and other political activities. According to figures published by the Energy and Policy Institute, FPL spent over $8.1 million on state-level campaign funds and political committees in the 2018 Florida gubernatorial cycles and $5.1 million in the 2020 cycle.

73.     In addition, NextEra engaged in a series of undisclosed political spending campaigns designed to advance its interests outside the public eye, notably through the hidden funding of 501(c)(4) organizations, which unbeknownst to the public, did NextEra's bidding.

21

74.     NextEra also used its market power and influence to prevent, obstruct, and delay its competitors' business activities, which cost them and the consumer millions of dollars.

**A.     NextEra's Obstruction of a Competitor's Energy Project in New England**

75.     NextEra has spent years fighting construction of the NECEC in Maine. In 2017, the State of Massachusetts contacted Avangrid, Inc. ("Avangrid") – a NextEra competitor – to develop the NECEC from the Canadian border to Lewiston, Maine, where power from hydroelectric facilities in Quebec would enter the regional power grid. Avangrid's project represented an additional power source for the region, which threatened NextEra's market share and profits.

76.     At every step of the way, NextEra abused the regulatory, ballot initiative, and courtroom processes to obstruct the construction and implementation of the NECEC.

77.     NECEC required various state and federal permits and approvals from agencies including the Massachusetts Department of Public Utilities ("DPU"), Maine Department of Environmental Protection ("DEP") and Maine Public Utilities Commission ("PUC"). To slow down the permitting process, NextEra unsuccessfully intervened in all three regulatory proceedings to oppose NECEC. NextEra then unsuccessfully appealed each regulatory decision.

78.     After exhausting the permitting process as a delay tactic, NextEra turned to the ballot box and backed two unconstitutional referendums in Maine to deny or further delay the implementation of NECEC.

79.     During the summer of 2019, after the PUC had issued a certificate of public convenience and necessity for NECEC, NextEra reviewed the language of a referendum which, if approved, would force the PUC to reverse the certificate. Avangrid successfully challenged the

initiative in the Maine Supreme Judicial Court as an unconstitutional circumvention around Maine's guaranteed separation of powers.[2]

80.    After the first unconstitutional ballot referendum, NextEra worked to get a second referendum on the ballot in November 2021, revoking NECEC's certification by preventing construction of transmission lines in the Upper Kennebec Region – with retroactive effect. After the referendum passed, Avangrid successfully challenged it in the Maine Supreme Judicial Court as an unconstitutional violation of NECEC's due process rights under the vested rights doctrine.[3] The Maine Supreme Judicial Court also found that the second referendum unlawfully targeted NECEC, stating: "Opponents have swapped a targeted directive in the first initiative for a nominally nontargeted retroactive mandate in the one before us now."[4]

81.    This was not the last of NextEra's meddling. After the NECEC was constructed, it needed increased capacity at the NextEra owned Seabrook Station circuit breaker (the "Seabrook Breaker") for its energy to flow into the grid.

82.    ISO New England, which operates the regional power grid, determined that the Seabrook Breaker was already operating at 99.6% capacity, and would require an upgrade before NECEC could connect to the grid without risking a catastrophic short circuit.

83.    Under the terms of the regional power operating contract (known as a "tariff"), Avangrid, not NextEra, would be responsible for the direct costs of upgrading the Seabrook Breaker. Despite proposing to undertake construction of the Seabrook Breaker upgrade during a planned downtime at Seabrook Station, NextEra refused to allow Avangrid to upgrade the

---

[2] *Avangrid Networks, Inc. v. Sec'y of State*, 237 A.3d 882, 895 (Me. 2020).
[3] *NECEC Transmission LLC v. Bureau of Parks & Lands*, 281 A.3d 618, 630 (Me. 2022).
[4] *Black v. Bureau of Parks & Lands*, 288 A.3d 346, 364 n.13 (Me. 2022).

Seabrook Breaker unless Avangrid promised to reimburse NextEra for all the indirect costs associated with the construction, which included legal costs and lost profits.

84.     The parties brought the dispute to FERC, which ruled largely in favor of Avangrid. NextEra then petitioned the D.C. Circuit Court of Appeals for review. In a hearing before the court, NextEra openly boasted that it held "veto" power over Avangrid, and any other potential competitor who wished to connect new power to the regional grid. The court found that "its refusal to upgrade the breaker would prevent new generators from joining the grid and thus ensure that the breaker remain adequate" – was "anti-competitive behavior" incompatible with "good business practices" as required under NextEra's legal obligations.[5] The court affirmed the FERC order and NextEra finally completed the Seabrook Breaker upgrade in November 2024, after years of obstructionism.

85.     As a result of the above, in November 2024, Avangrid filed the Antitrust Action against NextEra, which seeks over $350 million in damages.

**B.     NextEra's Hidden Funding to Thwart Construction of the NECEC**

86.     As part of its anticompetitive efforts to undermine NECEC, NEER surreptitiously funneled money through a series of unrelated 501(c)(4) entities to support the planned 2020 citizen initiative in Maine to oppose NECEC. After a multi-year investigation into the alleged wrongdoing, the Maine Commission on Governmental Ethics and Election Practices (the "Commission") entered consent orders with two of those entities for violations of Maine campaign finance laws.

---

[5] *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 370 (D.C. Cir. 2024).

87.     Those entities are Bernstein, Shur, Sawyer & Nelson, P.A. ("Bernstein Shur"), a Maine law firm, and The Hawthorn Group, L.C. ("Hawthorn"), which is a public affairs and communications consulting firm based in Alexandra, Virginia.[6]

88.     In or around early 2018, Hawthorn approached government relations consultants employed by Bernstein Shur and another Maine government relations consultant (together with Bernstein Shur the "Maine consultants") about doing work to oppose NECEC on behalf of a "Client", which in truth was NEER.

89.     For the next two years, the Maine consultants worked as a team to organize opposition to NECEC and influence public opinion against the project. Stop the Corridor was formed in April 2018 as a Maine limited liability company, Clean Energy for ME, to conduct these activities. The Maine consultants understood this to mean that, if Maine law required an activity to result in the disclosure of the name of Hawthorn of NEER, the Maine should not engage in such activity.

90.     The Maine consultants assert they believed their activities required Stop the Corridor to register as a ballot question committee or to identify its source of funding under Maine law. The Commission staff's investigation did not find evidence that the Maine consultants believed otherwise.

91.     Stop the Corridor worked with other organizations that opposed the NECEC, which included, among others, the Natural Resources Council of Maine ("NRCM"), the Sierra Club, and

---

[6] The following factual allegations are taken from the November 29, 2023, consent orders entered by Maine Commission, found at (https://www.documentcloud.org/documents/24189988-stop-the-corridor-consent-agreement_0#document/p3/a2414135) and (https://www.document-cloud.org/documents/24212709-alpine-initiatives-consent-agreement#document/p2/a2421030), respectively.

an association of volunteers that had been organized through a Facebook page. Stop the Corridor engaged in a series of activities to oppose NECEC that did not implicate Maine's campaign finance laws, which included, among other things, coordinating citizens to oppose NECEC in municipal proceedings, influencing public opinion through advertising, and coordinating with coalition partners on generating comments to state and federal agencies. During 2019-2020, the Maine consultants worked closely with Hawthorn through regularly scheduled phone calls, emails and update calls. Decisions about Stop the Corridor's operations were made through the Maine consultants and a representative of Hawthorn. Hawthorn received weekly reports on the progress of general activities to oppose NECEC in Maine. Hawthorn financially managed Stop the Corridor and provided 100% of its funding with fees collected from NEER.

92. During the summer of 2019, the coalition of NECEC opponents promoted a law that would direct the PUC to reverse a certificate of public convenience and necessity that was issued for NECEC in May 2019. NEER reviewed the language of this initiative.

93. The Maine consultants paid six field workers to train volunteers on the technicalities of collecting signatures on petitions. The firm funded other activities to help with the petitioning effort such as travel, a website for volunteers to sign up to petition, printing, postage, and office supplies. The total value of these services ($85,726) was communicated to a PAC, No CMP Corridor, which reported them as in-kind contributions in three campaign finance reports filed with the Commission from October 2019 to April 2020. The reports indicated that Stop the Corridor had engaged in paid activities to assist with petitioning but did not disclose any information about the sources that paid for Stop the Corridor's assistance.

94. The Maine consultants also provided information and recommendations to promote the successful collection of signatures and related services to qualify the 2020 initiative for the

ballot. Hawthorn, through Stop the Corridor, paid Bernstein Shur for strategic political advice concerning the 2020 initiative. For purpose of the campaign finance report required by the Consent Agreement between the Commission and Stop the Corridor, on November 29, 2023, the parties agreed and stipulated that $10,000 was the total amount of fees paid to Bernstein Shur that were reportable as campaign expenditures.

95.     The anti-NECEC coalition submitted the signed petitions to the Maine Secretary of State on February 3, 2020. While the petitions were deemed valid, the Maine Supreme Judicial Court ultimately determined that the 2020 initiative would not appear on the ballot and, accordingly, the 2020 initiative was never presented to Maine voters.

96.     The Commission, after reviewing thousands of pages of documents and conducting witness interviews, determined that Stop the Corridor violated Maine campaign finance laws by failing to register as a ballot question committee and failing to file the requisite campaign finance reports.

97.     The Commission also found that another Maine limited liability company ("LLC"), Alpine Initiatives, was used by NEER to contribute to the Maine Democratic Party without disclosing where the funds were coming from.

98.     In furtherance of the scheme, Bernstein Shur employees provided a mix of legal and consulting services for this purpose from 2018 to 2020. As with Stop the Corridor, in early meetings with the Berstein Shur consultants in late 2017 or 2018, Hawthorn told the Bernstein Shur consultants that they should not disclose Hawthorn or NEER's involvement, and that all activities should be conducted in accordance with Maine law.

99.     In October 2018, Bernstein Shur consultants believed that Democratic officials were more likely to oppose the NECEC project. The Bernstein Shur consultants explored the

feasibility of making a substantial contribution to the Maine Democratic Party in connection with the "get out the vote" activities related to the upcoming general election.

100.    Around two weeks before the November 6, 2018, general election, one of the Bernstein Shur consultants called the Deputy Director of the Maine Democratic Party to discuss a potential donation toward the party's "get out the vote" activities. The consultant asked whether a donation of $100,000 or $150,000, would be spent before election day. The former Deputy Director confirmed that the party could use that money to expand the party's activities to contact voters and encourage them to return absentee ballots. The Bernstein Shur consultant did not identify the donor, and no policy agenda was attacked to the contribution. In a second conversation with the Deputy Director, the Bernstein Shur consultant confirmed that the amount would be $150,000 and that the donor would be the newly formed Alpine Initiatives. The Commission's staff investigation did not conclude that NEER knew the purpose of the funds or to whom they would be paid.

101.    From October 23 to 24, 2018, the Bernstein Shur consultants and Hawthorn agreed to form a new LLC to donate to the Maine Democratic Party. The funds would flow from NEER to Hawthorn, to Alpine Initiatives, and then finally to the Maine Democratic Party.

102.    On Monday, October 29, 2018, Hawthorn executed on the plan by transferring $160,000 to the Alpine Initiatives' bank account. Thereafter, on October 30, 2018, Alpine Initiatives wired $150,000 to the Maine Democratic Party.

103.    In a 24-Hour Report filed with the Commission on October 29,2018, or eight days before the general election, the Maine Democratic Party reported receiving $150,000 from Alpine Initiatives. The party also reported the contribution in its 42-Day Post-General Election Report filed on December 18, 2018.

104.    Alpine Initiatives was the only source reported to the public of the $150,000 contribution identified in the Maine Democratic Party campaign finance reports filed with the Commission. The public did not know the true source of the contribution because it was reported in the name of the Alpine Initiatives.

105.    Alpine Initiatives did not register and file campaign finance reports with the Commission as a PAC. Nor did Alpine Initiatives participate in any commerce within its 14-month existence. The $150,000 contribution was Alpine Initiatives' only activity, other than the administrative tasks required to maintain the LLC. Alpine Initiatives did not lobby or participate in any other political activities before dissolving on December 31, 2019.

106.    Following an investigation into Alpine Activities by the Commission, which included reviewing documents and conducting witness interviews, the Commission ultimately determined that Alpine Initiatives violated Maine campaign finance laws by failing to register as a PAC and failing to file the requisite campaign finance reports.

C.    **NextEra's Illicit Political Activities in Florida**

107.    As set forth above, Matrix markets itself as a political consulting firm offering services in research, polling, public relations, and campaign management. According to minimalist public website, Matrix's motto is "A Comprehensive Approach to Problem Solving."[7] Matrix is headquartered in Montgomery, Alabama, and was founded by Dr. Joseph Perkins. Jeff Pitts joined Matrix in 1995 and became its CEO in 2000.

108.    Media reports describe Matrix as "secretive" and "the closest thing Alabama politics has to a non-governmental secret agency."[8] Matrix has lent its services to several energy

---

[7] MATRIX, https://www.matrixllc.com/ (last visited March 24, 2026).
[8] Mario Alejandro Ariza & Miranda Green, *Leaked: US power companies secretly spending*

companies in the Southeast United States such as Southern Company, Alabama Power, Mississippi Power, and FPL.

109.    The second amended complaint (the "Securities Complaint") in the Securities Class Action contains several allegations from Matrix employees ("ME_"), who described the unethical and potentially illegal aspects of the Matrix-FPL relationship. Securities Class Action, ECF No. 68.

110.    According to ME1, Pitts aggressively worked to expand Matrix's business and opened an office in Tallahassee, Florida, as part of that expansion. Pitts brought three associates: Greg Gilbert ("Gilbert"), April ("Odom"), and Abigail MacIver ("MacIver"). According to ME1, "only a few Matrix people got to do stuff in Florida. It was a black box. Pitts kept it to himself. That was the source of the problems."

111.    According to ME1, in December 2020, Pitts advised Perkins that he was leaving Matrix to start a new firm, Canopy Partners LLC ("Canopy"). After Pitts left Matrix, Matrix discovered that "a server was left in Birmingham", Alabama that someone had tried to destroy with a hammer in an apparent attempt to prevent access to the server's contents. However, despite those efforts to destroy the server, Matrix employees gained access to the server, which contained evidence and information of all the work Pitts was doing from FPL, and concealed from most Matrix employees and Perkins, according to ME1.

112.    ME1 was one of the Matrix employees who was brought in to assist with the evaluation of the information recovered from the damaged server. ME1 said that Matrix discovered

---

*millions to protect profits and fight clean energy*, THE GUARDIAN (July 27, 2022), https://www.theguardian.com/environment/2022/jul/27/leaked-us-leaked-power-companies-spending-profits-stop-clean-energy.

"another set of books" that was maintained by Gilbert in furtherance of the FPL schemes. According to ME1, Pitts' team in Tallahassee "did the spreadsheets" and "kept the separate books" for the scheme. "There was a lot of misbehavior by the Florida crew. The FPL executives are tied up in it. There was a lot of money going into LLCs and disappearing."

113.    ME1 stated that the Matrix investigation uncovered a scheme concerning the political campaign in Miami-Dade County, the late-filed Form 990s, and money flows that were highly suspicious.

114.    After Pitts left Matrix, Perkins filed suit against Canopy, Pitts, Gilbert, MacIver, and Odom (each person who left Matrix to join Canopy) in the Circuit Court of Jefferson County, Alabama. ME1 stated that as support for the lawsuit, he was part of the team that uncovered Pitts' conduct. This team discovered Pitts' (and others') involvement in the "ghost candidate" scheme. ME1 further stated that the scheme, as reported by the press, was orchestrated by Pitts and ME1 was "sure Eric Silagy was aware of the scheme."

**D.      FPL's Failed Effort to Buy the Jacksonville Electric Authority.**

115.    In 2019, NextEra bid $11 billion to acquire the Jacksonville Electric Authority ("JEA"). FPL and its officers worked with Matrix to exploit the political process in an attempt to tilt the tables towards FPL, including a potential plan to bribe a Jacksonville councilperson. The JEA purchase process eventually fell apart amid scandal, which is the subject of two ongoing federal criminal prosecutions.

116.    The JEA is an independent agency of the City of Jacksonville, and a non-profit utility company serving the Jacksonville area. The JEA has a substantial customer base which includes around 500,000 individuals relying on electric, water, and sewer services. As one of the

31

largest publicly owned utilities in the nation, JEA operates under the governance of a seven-member board appointed by the Mayor of Jacksonville and confirmed by the City Council.

117. FPL's service area surrounds and touches the area served by JEA, thereby creating a "hole" in FPL's coverage. In late 2017, JEA began considering privatizing their utility services.

118. On July 23, 2019, the JEA Board of Directors authorized JEA's senior leadership to begin the process of selling JEA. This involved issuing an Invitation to Negotiate ("ITN") as required by Florida law for procurement. The ITN called for written proposals from vendors or bidders to compete for the opportunity to negotiate. Before the privatization of JEA could be finalized, the selected bidder would need to secure approval from the JEA Board, the Jacksonville City Council, and the support of Jacksonville voters through a successful referendum vote.

119. On the same day, the JEA Board also authorized senior leadership to establish a long-term incentive plan and Performance Unit Plan ("PUP") that would compensate participants in part based on the amount of capital collected by the City of Jacksonville from the sale of JEA.

120. Because of its large customer base and service region, JEA was an appealing acquisition target for NextEra and FPL. The Company scrambled to position itself for success in obtaining Jacksonville City Council approval and a prospective referendum.

121. FPL and Silagy relied on Matrix and its resources to engage in improper tactics during FPL's efforts to purchase JEA. These tactics included (1) making a fake job offer to a City Councilor who was opposed to privatization to get him out of the way; and (2) secretly monitoring a journalist who was critical of FPL's bid and the privatization of JEA.

122. The JEA privatization plan ultimately fell apart because of a related internal scandal. The Jacksonville Council Auditor uncovered that JEA's CEO Aaron Zahn ("Zahn") and Chief Financial Officer Ryan Wannamacher ("Wannamacher") would receive millions of dollars

in bonuses if JEA went through with the privatization under the terms of the PUP. The JEA Board revoked PUP and paused the JEA auction process after this information became widely known. On March 2, 2022, the U.S. Department of Justice indicted Zahn and Wannamacher for conspiracy.

123.    Notably, FPL went to great lengths to conceal Matrix's role in the Company's efforts to buy JEA. For example, in response to a subpoena issued on April 7, 2020, by a special Jacksonville City Council committee tasked with examining the failure of the JEA privatization process, NextEra did not include Matrix in the list of firms it engaged to work on its proposal or lobby on its behalf

124.    When confronted with evidence of Matrix's conduct during the attempted purchase of JEA, FPL and NextEra admitted that Matrix had been hired to "assist our company with due diligence, public outreach, and communications efforts during the sale process," but they also issued a series of false denials to distance the Company from the alleged conduct.

125.    Furthermore, as detailed below, when asked directly by reporters whether he had been subpoenaed by federal prosecutors in connection with the criminal case against Zahn and Wannamacher, Silagy falsely claimed in May 2022 that "we've never been subpoenaed," in connection with the prosecution with the prosecution of JEA's former executives when, in fact, federal prosecutors issued a subpoena to NextEra regarding the JEA scandal on April 21, 2020.

### E.    Matrix's Phony Job Offer

126.    In late 2017, reverend De-Ves Toon ("Toon"), a National Field Director for the National Action Network who had recently arrived in Jacksonville, began to organize a new group called "Fix JEA Now."

127.    Fix JEA Now was substantially funded by FPL through a series of surreptitious funds distributed through intermediate groups formed and managed by Matrix personnel.

According to the Securities Complaint, ledgers for various entities controlled by former Matrix employees, show that more than $180,000 in total payments went to Toon in 2018. Some of these payments are specifically related to the JEA initiative. Most of them refer to FPL as the entity who was invoiced for the various payments.

128.    FPL has since acknowledged that it was "aware that Matrix was paying Rev. Toon to support a number of polling and outreach efforts for multiple clients" and that it "had knowledge of Fix JEA Now organization." ME1 confirmed that they worked under Pitts' instruction and on behalf of FPL of establish a website for "Fix JEA Now" to "get people fired up to divest from JEA."

129.    In 2019, during the JEA privatization process, Toon served as the intermediary for a questionable employment offer made to Jacksonville City Councilor Garrett Dennis ("Dennis"), a fierce opponent of JEA privatization.

130.    According to the *Florida Times-Union*, Toon urged Dwight Brisbane, a consultant with ties to Dennis, to communicate an offer to work for "Grow United," a group that purportedly advocated for marijuana decriminalization. The job offer included a $180,000 yearly salary and compensated travel expenses but was contingent on Dennis leaving the Jacksonville City Council.

131.    Dennis later informed reporters that the offer seemed suspicious. Dennis dismissed the offer as a scam after seeing that Grow United had no major online presence.

**F.      FPL's VP of Legislative Affairs Was Aware of Matrix's Covert Surveillance of a Journalist**

132.    Throughout the purported sales process, Florida Time-Union reporter, Nate Monroe ("Monroe"), wrote a series of columns criticizing JEA for its attempted sale to a private buyer. These columns criticized both the sales process and the potential impact on the people of

Jacksonville. In one column, Monroe wrote, "[e]ven in this town, the total secrecy of the negotiation process is a hard sell . . . Everyone is simply supposed to rejoice and ask no questions when [JEA CEO Aaron] Zahn emerges from the shadows with a fully negotiated deal." His criticism of a potential deal was especially sharp when he covered FPL's bid:

> So let's say Zahn gets his way and JEA is sold to our fake power company, Florida Flower and Bright. And let's say Florida Flower and Bright owns all the service territory around Jacksonville, as well as the territory including millions of more customers elsewhere in the state. Who actually thinks our made-up utility won't be cutting significant staff after it acquires JEA? Will Florida Flower and Bright promise that by 2030 it will still employ 2,000 people? Or will Florida Flower and Bright — with a robust network of its own power plants, transmission lines, offices and customer-service centers — shuffle around a few regional resources and decide it can save money by cutting its newly acquired utility?

133.    ME1 indicated that Martell traveled to Matrix's offices on multiple occasions for in-person meetings. According to ME1, Martell "reported directly to Silagy" and there were no intermediaries between the two FPL executives.

134.    Monroe's coverage of FPL continued into 2020, and Matrix continued to stalk him. On October 1, 2020, Monroe published a post titled "Dear FP&L: It's Not Really Charity if You Get Something Out of It." The piece chastised FPL for attempting to sway the votes of Jacksonville city councilors with gifts to their nonprofits in an effort to support FPL's efforts to purchase JEA.

135.    Monroe's negative article resulted in increased surveillance – according to the *Florida Times-Union*, Matrix received a photograph of Monroe, his girlfriend, and his dog outside their apartment with a timestamped Oct. 14 2020, two weeks after the column.

136.    When confronted with proof of Monroe's monitoring, FPL and Silagy made false and deceptive statements and denied having requested the report or approved his surveillance.

*FPL and Matrix Orchestrate the "Ghost Candidate" Scheme*

137.    Matrix personnel kept detailed ledgers of FPL's political spending, which Pitts' team helped surreptitiously direct to at least five "ghost" candidates — two in the 2018 cycle, and three in the 2020 election cycle to siphon votes away from candidates FPL opposed.

138.    The majority of Matrix and FPL's target races involved candidates for the Florida State Senate. Florida State Senate seats are especially important to FPL since the Florida Senate appoints members of the FPSC, which supervises FPL and other utility corporations.

139.    With Silagy's direct involvement in planning, and with FPL personnel involved in execution, Pitts and his Matrix subordinates established at least 19 different 501(c)(4) non-profit entities to form a "daisy chain" through which FPL money could be effectively laundered to support or oppose political candidates, while concealing FPL's involvement from the public.

### A.  Spoiler Candidates in the 2018 Election Cycle State Senate District 8

140.    In the run-up to the 2018 election for Florida State Senate District 8, an incumbent senator supported by FPL faced a tough fight from challenger Kayser Enneking ("Enneking").

141.    FPL and Matrix initially tried and failed to defeat Enneking during her primary election. With Silagy's direct involvement, Matrix and FPL established a 501(c)(4) entity, Mothers for Moderation, to secretly inject FPL money into the 2018 elections and beyond, starting with Enneking's primary in early 2018. Mothers for Moderation reportedly spent $100,000 on mailers and television advertising supporting a political committee called Liberation Ocala that backed Enneking's primary opponent. Mothers for Moderation provided all of Liberation Ocala's funds that year.

142.    Mothers for Moderation was almost entirely funded by FPL. According to an internal Matrix ledger obtained by the *Orlando Sentinel*, FPL donated almost $14 million to

Mothers for Moderation between August and December 2018 alone, accounting for virtually all of the organization's revenue that year.

143. Likewise, Broken Promises, another NextEra backed entity, made a direct $20,000 donation to Charles Goston's ("Goston") political committee. Goston was a no-party straw candidate who shared Enneking's political views and entered the race with the intention of fragmenting Enneking's support base. The sole entity that contributed to this committee was Broken Promises.

144. Two weeks later, Broken Promises spent $52,000 on mailings to promote Goston. Following receipt of a second $100,000 installment form FPL, Broken Promises continued to support Goston with approximately $63,000 in advertising. The combined value of the two "in-kind" advertising gifts was approximately $115,000. These costs made up 71.7% of all the money Broken Promises spent in 2018.

145. Political participation is allowed for organizations such as Broken Promises, which are governed by 26 U.S.C. §501 (c)(4) in addition to their general advocacy of "social welfare" activities. Nonetheless, the IRS does not view political activity as advancing societal welfare. A 501(c)(4) organization's principal goal cannot be to carry out political activities to preserve its tax-exempt status and, consequently, hide their funders. Assessing whether political spending makes up more than half of an organization's expenses in one general guideline the IRS employs to decide whether political activity is a 501(c)(4) organization's main focus.

146. Broken Promises listed only $45,000 in expenses as "Lobbying" in its federal tax filing on Form 990. This amount would cover the $20,000 that the organization gave to Goston's political committee and the $25,000 that Broken Promises gave to Consumers to Energy Fairness, another PAC.

147.   The tax filings of Broken Promises also listed $115,510 (about the entire amount spent on the Goston supporting advertisements) as "other" spending, however, none of these amounts were disclosed as political spending. Instead, in response to the question, "[d]id the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office?" Broken Promises replied "No," and did not submit the necessary Form C disclosure along with its Form 990 disclosing political contributions. After studying Broken Promises' tax returns, a Loyola Marymount University tax law professor who was interviewed by the *Tampa Bay Times* in August 2022 verified that this depiction did "not seem accurate at all," considering that Broken Promises' 2018 spending would be considered "political activity."

148.   Companies such as FPL are also permitted to contribute to politics. However, it is illegal under federal and Florida law to conceal political contributions via "straw" donors like Broken Promises. Giving money under another person's name is forbidden by the Federal Election Campaign Act ("FECA") and Florida law bars giving money "through or in the name of another, directly or indirectly, in any election." FLA. STAT. § 106.08(5)(a).

149.   When the media began to question FPL's involvement in the 2018 District 8 contest in August 2022, FPL did not refute having contributed to Broken Promises.

150.   In an interview with the *Tampa Bay Times* for a story published on August 8, 2022, a tax law expert from the University of Pittsburg Law School said that FPL's use of Broken Promises to hide contributions in favor of Goston "tells you have concerns about disclosing their support of this candidate to voters and they had some intention to hide it."

151.   Enneking was defeated by less than two thousand votes. Enneking asserted that during "policy debates" with Goston, "there was not one iota of difference between what he was

38

advocating for and what I was advocating for," except to the extent the similarities would help to effectively siphon votes from Floridians who could not distinguish between the two.

152. At $145,000, Goston's campaign budget was significantly less than that of his opponents in the District 8 race. Enneking told the *Tampa Bay Times* in August 2022 that sponsoring a spoiler candidate was a "cheap way to siphon votes off."

153. On December 17, 2020, a nonpartisan, nonprofit watchdog group called Citizens for Responsibility and Ethics in Washington (or "CREW") filed a complaint with the IRS, requesting an investigation into whether Broken Promises "violated federal law by failing to properly disclose its political contributions" in 2018. According to the complaint, Broken Promises engaged in political activism as its primary activity in 2018 and neglected to disclose its political spending on Form 990 in violation of 26 U.S.C. §§501(c)(4) and 6652. Two weeks later, Broken Promises filed for dissolution.

154. FPL opposed Danielle Levine Cava ("Cava"), who was an incumbent candidate in the 2018 Miami-Dade County Commission District 8 race. Cava had previously opposed FPL's plans related to its Turkey Point nuclear power plant.

155. In early 2018, a website smearing Cava as an elitist went live. This site was set up by Matrix, at the behest of FPL. However, Cava's base of support remained strong despite FPL's efforts, and she was still favored to win the upcoming August 2018 election. Pitts and his associates at Matrix, therefore, made a new scheme to split Cava's base in two by introducing a politically similar challenger. Matrix did not have any hope or desire for the challenger to win but believed that the challenger could eat into Cava's support enough to force her into a run-off with her opponent, Gus Barreiro ("Barreiro").

156. According to a story published by the *Miami Herald* on August 25, 2022, Matrix focused its efforts on Johnathan Burke ("Burke"), a 33-year-old man with several arrests on his record and who had never run for office before. Pitts met Burke on June 11, 2017, and on the next day, Pitts texted Burke: "look forward to working together."

157. On June 20, 2017, Burke spoke at a city commission meeting in South Miami in opposition to a proposed ordinance which would require contractors meeting in South Miami in opposition to a proposed ordinance which would require contractors to install solar panels on newly constructed residences. FPL was strongly against that ordinance at the time.

158. To support Burke's 2018 candidacy, Matrix secretly sent $12,000 in FPL funds to a political strategy firm called PDG Strategies to advise Burke's campaign. An executive at PDG Strategies confirmed that Matrix paid PDG Strategies to work on Burke's campaign, as reported by *Miami Herald* story.

159. These funds were not; however, the only support FPL provided for the candidate. Using $120,000 in FPL funds, routed through an Alabama-based company called Tarella, Inc. ("Tarella"), Pitts paid Burke a $60,000 salary in 2017 and also paid Burke paid $2,300 per month starting in 2017 to cover the rent for Burke's home in Miami-Dade District 8, according to internal Matrix financial records, emails, and text messages the *Miami Herald* obtained and reported on the August 25, 2022, story. The *Miami Herald* reported in the same story that "[s]everal of the payments to Tarella [we]re marked 'Miami Dade Election' or 'County Commission'" and "[a]ll the transactions were listed as being made with FPL funds."

160. Because Burke needed to live in Miami-Dade Commission's District 8 for six months to be able to run against Cava, Pitts arranged to move him to a home in Cutler Bay on FPL's dime. Tarella – a firm founded by a former Matrix lobbyist, Paul Hamrick ("Hamrick"), who

worked closely with Pitts and sometimes out of Matrix's office – wrote a letter to Burke's landlord on August 23, 2017, memorializing an oral agreement for Tarella to pay Burke's $2,300 rent, according to documents obtained by the *Miami Herald*. The letter suggested that it was important to Burke to stay in the area because of the "school district," and added "it certainly is important to this company for his residency to be resolved."

161.    On February 6, 2018, Hamrick texted Pitts, alerting that Burke's rent was due, but Tarella had insufficient funds to pay it. Pitts asked for Hamrick to forward along the invoice so he could "take care of it." A Matrix ledger then showed, the next day, Matrix sent $2,500 to Tarella with a note stating that the money came from FPL.

162.    On March 13, 2018, according to the Matrix documents disclosed by the *Miami Herald*, Hamrick sent an email message to Pitts with the subject line "Miami." Hamrick told Pitts they needed to get Burke to announce his candidacy for the upcoming election, and that he thought Burke would be "effective if we just have a plan we make him follow."

163.    On August 28, 2018, Cava was reelected with 62% of the vote. Matrix's plan failed, primarily due to Barreiro's poor showing with 21% of the vote. However, the spoiler candidate – Burke had successfully siphoned away 17% of votes.

164.    Another individual, Dan Newman ("Newman"), also worked to advise Burke. Newman was a Matrix subcontractor who had previously worked as a lobbyist at a firm representing FPL and as a fundraiser for the Florida Democrats' Legislative Committee. Newman sent a text message to Pitts and MacIver sharing the election results on August 28, 2018. MacIver responded: "Well that's a respectable vote number for [Burke]. If [B]arriero had done a decent job our plan might have paid off."

41

165. After the election, Pitts suddenly ended almost all contact with Burke. On October 26, 2018, Burke texted Pitts stating that he had "not heard much since Election Day" and asked if he should "expect to see or hear from anyone again or is this the end of the road?" Pitts did not respond. Then, on Wednesday, February 27, 2019, Burke texted Pitts acknowledging that "Friday March 1st marks the conclusion of our agreement and will be the last time I have to bug you about funds, unless further work is agreed upon." Again, Pitts did not respond.

166. Cava ran for Mayor of Miami-Dade County in 2020 and won the election on November 3, 2020. During this election, a news website called the *Capitolist* ran a piece attacking Cava on June 4, 2020. The *Capitolist* was funded by FPL at the time, through a Matrix shell entity that had executive and editorial control over the news website. Silagy and Martell were frequently consulted for approval or edits to stories and requested pieces on specific subjects.

167. According to August 25, 2022, report on the *Miami Herald*, the day after the June 2020 *Capitolist* piece attacking Cava was posted, FPL Vice President of External Affairs and Economic Development Pam Rauch texted Pitts: "She deserves this!" in response to the story. Silagy responded to the story via text to Pitts to the next day: "Love it!"

**B.      Ghost Candidates in the 2020 Election Cycle**

168. In mid-2020, several of the FPL's favored candidates for Florida State Senate seats were locked in competitive races with candidates the Company wished to unseat. During this election cycle, Matrix and FPL applied the lessons they learned in 2018 and used even more sophisticated strategies to steal votes from FPL's political rivals.

169. The scheme centered on running and promoting at least three "ghost" candidates – persons who had no interest in campaigning or actually holding office but who were paid or otherwise induced to enter the race to divert votes away from legitimate candidates. In a close

election, the ghost candidates would be pushed using fictitious names, platforms, or other characteristics that resemble FPL's disfavored candidates to divert enough votes to swing the result.

170. The three ghost candidates were Jestine Iannotti ("Iannotti") in Senate District 9, Alex Rodriguez in Senate District 37, and Celso Alfonso in Senate District 39.

171. Frank Artiles ("Artiles"), a former senator of District 40, was actively involved in in the scheme. Prosecutors from the Miami-Dade State Attorney's Office claim that Artiles made former baseball player Alex Rodriguez an offer of $50,000 to run in the District 37 election.

172. At the time, Artiles was employed as a contractor by the nonprofit organization Let's Preserve the American Dream ("LPAD"), where he reported to Alex Alvarado ("Alvarado"), a political operator.

173. According to documents made public by the Miami-Dade State Attorney's Office, Artiles has received $125,000 from LPAD for "South Florida research services" since 2017. The last payment to Artiles on November 15, 2020, three days after District 37 incumbent Senator Jose Javier Rodriguez ("Senator Rodriguez") lost in a recount.

174. LPAD, in turn, was associated with a lobbying entity called "Associated Industries of Florida," or "AIF." LPAD operated out of AIF's building, and AIF's former Vice President, Ryan Tyson ("Tyson"), was listed as LPAD's executive director in 2020 according to LPAD's 2020 Form 990, filed on November 17, 2021. The *Orlando Sentinel* reported on July 30, 2021, that "Alvarado sometimes forwarded Artiles' invoices to an executive at AIF," and reported on November 18, 2021, that FPL was an AIF member and one of the AIF's biggest donors.

175. LPAD did not disclose its donors in 2020. A prior entity with the same name as LPAD, however, was run by the same person and out of the same address from 2014 to 2016. That

entity, which was organized at the state level in Florida and was required to disclose its donors, was funded by FPL, according to a November 18, 2021, *Orlando Sentinel* story.

176.    The ghost candidates were promoted by two political committees: "The Truth," which sent mailers supporting Iannotti in Senate District 9, and "Our Florida," which sent similar materials in support of Alex Rodriguez and Celso Alfonso to voter in District 37 and 39, respectively. Both committees were run by LPAD's Alex Alvarado, and like LPAD, were run out of AIF's headquarters.

177.    Unlike the 2018 spoiler candidates backed by FPL, who at least pretended to promote themselves through cheap, bare-bones campaigns, the 2020 ghost candidates did almost no campaigning. Instead, The Truth and Our Florida spent $550,000 promoting the ghost candidates. For example, the *Orlando Sentinel* revealed over a year later, residents of Seminole and Volusia counties received mailers promoting Iannotti in the weeks leading up to the 2020 elections. The woman depicted on the mailers was Black, and the mailers stated that she had supported social justice and campaign finance reform. In fact, Iannotti was Caucasian and was planned to relocate to Sweden at the time.

178.    The official chairperson of the committee behind Iannotti's promotional material, "The Truth," was also a figurehead. Because political committee chairs must be disclosed, the LPAD political operative behind "The Truth," Alvarado, paid a 25-year-old college student named Hailey DeFilippis $1,500 to sign the committee's registration forms. Alvarado paid another woman, Sierra Olive, $2,000 to sign the paperwork making her the official chairperson of "Our Florida."

179.    "The Truth" and "Our Florida" were entirely funded by Grow United, the same 501(c)(4) organization that FPL and Matrix used the year before to offer Jacksonville City

44

Councilor Garrett Dennis a job in exchange for resigning from the council. Grow United contributed $550,000 to The Truth and Our Florida to fund the ghost candidate scheme. Odom who was working for Matrix at the time, and LPAD's Alvarado coordinated the payments.

180. According to LPAD's 2020 Form 990, Grow United received $1.15 million in "general support" funding from LPAD in 2020. At least $600,000 of that total was set aside for the political committees that promoted the phantom candidates.

### C. Matrix and FPL Established and Funded the Ghost Candidates' Funding Structure

181. On December 2, 2021, the *Orlando Sentinel* issued a report confirming that Matrix consultants who controlled Grow United, "the dark-money nonprofit at the center of the 'ghost' candidate scandal, billed FPL for more than $3 million days before they began moving money through the entity." Matrix sent invoices to FPL via several entities, including TMP Interactive, People Over Profits, and ENH Industries, and further directed the funds to Grow United, which in turn funded the two committees that paid for the mailers promoting the ghost candidates' campaigns. The article went on to state, "FPL has donated more than $10 million in recent years to other dark money non-profits controlled by some of the same consultants [Matrix] – and FPL CEO Eric Silagy has personally coordinated with those consultants on campaign contributions made through their nonprofits."

182. In the run-up to the 2020 election, FPL was particularly concerned that incumbent Senator Jose Javier Rodriguez would keep his seat in District 37. During his tenure, Senator Rodriguez opposed FPL's plans to expand a nuclear plant in South Florida and frequently irritated FPL executives with his policy positions in favor of deregulating energy production and sale.

According to a July 22, 2022, *Orlando Sentinel* report, FPL acknowledged that it "wanted the veteran senator out of office."

183.    According to the report, on January 7, 2019, Reuter sent an email with the subject "Florida Lawmaker Again Files Bill That Would Help Break Monopoly-Solar Stranglehold" to Defendants Robo, Silagy, and other NextEra personnel. The message included a story from the *Miami New Times* about a bill introduced by Senator Rodriguez that would allow "property owners to sell home-generated solar power, to others, including tenants[.]" According to this story, Florida's energy utilities, including FPL, were concerned about the possibility of individual property owners competing in the energy market. The story further quotes Senator Rodriguez as saying, "[s]imply put, the big utilities use their political muscle to maintain outdated monopolies."

184.    Also on that same day, Defendant Silagy forwarded Reuter's email about Senator Rodriguez's bill to Martell and FPL Vice President of Governmental Affairs John Holley. Silagy's message, read in relevant part: "JJR at it again. I want you to make his life a living hell . . .seriously."

185.    Martell forwarded Silagy's message to Jeff Pitts the same day.

186.    Matrix asked Dan Newman, a Matrix subcontractor who had previously worked as an FPL lobbyist, to concoct a scheme to remove Senator Rodriguez. Records from a criminal investigation into the ghost candidate scheme, released on January 18, 2022, revealed that Tyson told prosecutors Newman was working as a contractor for LPAD.

187.    According to the *Miami Herald*, Newman wrote a memo to Pitts on June 5, 2019, suggesting that a competing primary candidate could defeat Senator Rodriguez. The memo warned that if Senator Rodriguez kept his seat after the 2020 election, he would "have increased significance" due to his seniority in comparison to other officials. Although Newman's

memorandum focused on a primary challenge, and no primary challenge was ultimately mounted against Senator Rodriguez, it suggested a similar strategy to the past ghost candidate schemes in the general election.

188. According to Newman's memo, challenging Senator Rodriguez could cost $3.35 million to $3.8 million, including $500,000 to support the third spoiler candidate. Because "[i]n all likelihood, they will not have their own fund," Newman's budget included $450,000 for the promotion of the third candidate and $50,000 to build a "credible team." The memorandum requested that $3 million to the total budget come "from the client." These sums are similar to what FPL contributed to Grow United before it funded the ghost candidate committees ($3 million) and also similar to what Grow United contributed to the ghost candidate committees.

189. According to the Securities Complaint, on June 20, 2019, Martell sent Pitts an email with the subject "things to go over." Martell's list contained two of the four items: "SD 39" and "SD 37."

190. A month later, at 1:30 PM on July 19, 2019, Pitts met with Silagy, NextEra Vice President Julie Holmes, and other to discuss "Dereg Budget," according to an internal Matrix calendar. The meeting was scheduled on Pitts' calendar to take place in "Eric's office."

191. On October 3, 2019, Tyson sent an email message from his LPAD email address to Martell's FPL email address, with the subject line "Items you requested." The email attached Newman's June 2019 memo. The email began with the salutation "Danny-" and Tyson wrote that the attached was "our original proposal into SD 37 . . ." The attachment was titled "SD37 JJR PROPOSAL.pdf."

192.     Then, on October 9, 2019, Martell sent Pitts a text message, which read: "We need to catch up this pm. Eric has an ask." Shortly thereafter, Pitts remained an attorney to create legal entities for use funding for FPL's activities related to the 2020 election.

193.     Thereafter, Pitts retained an attorney to help create legal entities for use as funding vehicles for FPL's activities related to the 2020 election. According to the Securities Complaint, on October 16, 2019, Pitts sent an email to an attorney at Foley & Lardner LLP, copying two of his Matrix colleagues, stating that he wanted Foley & Lardner to "setup one LLC that would do work directly for the client" and another LLC or 501(c)(4) organization called "Proclivity Research" to provide "research and consulting" to the first entity. Pitts cautioned the email recipients "we need this to be strictly confidential between the three of us and those employed by the firm to work on this project."

194.     On November 26, 2019, Pitts sent an email to Silagy's "Theodore Hayes" pseudonym account with the subject line "Fwd: Updated Funding Memo PDF." Pitts stated that he had the "attorneys looking at a structure that would have the C corp owned by the [law] Firm. . ." The email contained two attached memos, the first a memo establishing a "structure for funding 2020 activities" (the "Funding Memo") and the second discussed legalities related to "federal elections support" (the "Legal Memo").

195.     The Funding Memo was authored by Pitts and was dated November 26, 2019, and was titled "FUNDING STRUCTURE FOR 2020." It listed the same goals as the previous schemes, but contained a focus on minimizing public reporting, but recommended the use of a C Corporation rather than an S Corporation.

196.     The Funding Memo included a flow chart demonstrating the flow of funds from FPL to several layers of entities. The initial step was from FPL to SUN Marketing, described in

the flow chart as "an LLC filed in Delaware requiring one individual & no public disclosure of that individual's name."

197.     SUN Marketing was incorporated in Delaware on December 13, 2019, approximately two weeks after Silagy received the Funding Memo and Legal Memo. On December 17, 2021, Reuter admitted to the *Orlando Sentinel* that FPL contributed $250,000 to SUN Marketing in December 2019 – at most two weeks after its official formation. Reuter also stated that FPL believed Matrix controlled SUN Marketing.

198.     The Robo Memorandum also detailed the creation of another 501(c)(4) organization, Grow United July 2019 – shortly after Newman wrote his memo about mounting a challenge to Senator Rodriguez and shortly after Martell listed "SD 39" and "SD 37" as items to "go over" with Pitts. The Robo Memorandum described Grow United as "an entity funded by FP&L" and "used by Pitts, the other former Matrix employees, and their FP&L cohorts as a vehicle for covert financial transactions, including an apparent attempted bride of a public official and disguised political contributions to fund ghost candidates in three Florida Senate races." "Internal documents," the Robo Memorandum continued, "show that FP&L officers were aware of and used FP&L funds to pay for the creation and subsequent activities of Grow United."

199.     The Robo Memorandum described and attached communications demonstrating FPL's involvement in the ghost candidate scheme, including the flow of funds from FPL into Grow United and from Grow United to the ghost candidate' political committees during the lead-up to the 2020 election.  As detailed in the Memorandum, Pitts directed $1,994,500 of the FPL funds received in September 2020 into People Over Profits, a nonprofit organization connected to Newman that was a major source of funds for Grow United, which as described above seeded the committees used to promote the ghost candidates.

49

200.     A September 24, 2020, text message thread regarding the District 37 race was also attached to the Robo Memorandum. The thread begins with Ryan Tyson texting a picture of poll numbers in District 37, showing Jose Javier Rodriguez and Illeana Garcia, both commanding 32.9% of the vote, but with the ghost candidate, Alex Rodriguez polling at 4.4%. "Well here's a way to start your morning," Tyson wrote in the message to Pitts and MacIver of Matrix and Martell and Holley of FPL. "Guess broadcast still works," Tyson wrote further down in the thread. The discussion then broadened to include District 9 and District 39, the two other ghost candidate races. FPL vice president John Holley affirmed that "[w]e are going to charge full speed ahead" in District 37 and the other races involving ghost candidates.

201.     According to the Securities Complaint, documents obtained through a public records request to the Florida's State Attorney's Office, Miami-Dade and Seminole Counties, filed by the Florida Center for Government Accountability confirm the amounts stated above were transferred from Grow United to the Truth and Our Florida.

202.     The documents showed a $100,000 wire transfer and $80,000 check from Grow United to the Truth on October 2, 2020, exactly as described in the messages, and a record from the Florida Department of State Division of Elections showing a $370,000 contribution from Grow United on October 3, 2020.

203.     According to the Securities Complaint, on October 16, 2020, MacIver forwarded to Tyson a *POLITICO* news story titled "Mystery donor spends $180K on Florida political mail." The story concerned The Truth's $180,000 in mailers and questioned who was funding it. The story reported "[a]s recently as May, the phone number listed as by [sic] the committee in campaign finance records also appeared in online advertising for female escorts." MacIver wrote: "These dark money groups are be[coming] pervasive. . ." In a responsive email, Tyson wrote: "[F]or the

record, there was no way to know this was an escorts number." "I think it's hilarious and just makes them more confused," MacIver responded to Tyson and Pitts.

204.     The ghost candidate scheme succeeded, FPL's preferred candidate won each of the three races. In District 37, Alex Rodriguez, a ghost candidate who shares Senator Jose Javier Rodriguez's last name, and the professional baseball player from South Florida, received 6,000 votes despite doing nothing to campaign for himself. Senator Rodriguez was defeated by Illeana Garcia by only 32 votes out of the 210,000 votes cast in the election. Likewise, FPL's ghost candidate Iannottti received 5,000 votes in District 9, but FPL's preferred candidate won that race by a 7,000 margin.

205.     The ghost candidate scheme drew the attention of prosecutors in Miami-Dade County. On March 18, 2021, Artiles surrendered to authorities, a day after police raided his home. He was charged with felony campaign finance violations, including conspiracy to make or receive illegal campaign contributions.

206.     On August 24, 2021, the *Orlando Sentinel* reported that Alex Rodriguez pled guilty to accepting approximately $45,000 in bribes to run in the District 37 senate race. Rodriguez agreed to three years of probation and agreed to cooperate in the Artiles investigation. Rodriguez, according to the Sentinel, "was struggling financially [Senator Frank] Artiles approached him [in 2020] and offered him $50,000 to file run as an independent" in District 37's neck-and-neck race.

207.     On January 5, 2022, the *Orlando Sentinel* reported that several people and entities connected with the ghost candidate scandals, including Alvarado, Alexander, Newman, and LPAD, had received a "prior to" letter from Miami-Dade prosecutors. According to an interview with a law professor at Florida International University, a "prior to" letter from the State Attorney's Office

typically alerts someone they are the target of an investigation and gives them a chance to sit for an interview with prosecutors. The story also stated that prosecutors had spoken with MacIver.

208.    According to the Securities Complaint, an email sent by the Miami-Dade State Attorney's Office to a Foley & Lardner attorney on July 12, 2021, billing records produced in response of a subpoena included "billing records between Foley & Lardner and Let's Preserve the American Dream," demonstrating that the same firm was representing LPAD and doing work for Matrix (which then billed to FPL) to set up a funding structure for the 2020 elections.

209.    The *Orlando Sentinel* reported on May 25, 2022, that Iannotti, the District 9 ghost candidate, had been arrested and charged with multiple misdemeanors and a felony for her role in the scheme, including accepting a $1,200 straw contribution.

**D.    The 2020 Funding Structure for FPL's Spending with Matrix Was Designed to Evade Detection**

210.    On October 2022, CREW filed a complaint with the Federal Election Commission ("FEC"), asking the agency to investigate Grow United, the Center for Advancement of Integrity and Justice, Florida Promise, Broken Promises, Richard Alexander (Odom's brother), "Unknown Respondents," and several other entities and the persons listed as their chairs for violations of the Federal Election Campaign Act.

211.    The "Unknown Respondents," which CREW stated, "may include corporations like Florida Power & Light," were identified as the person or persons who were "the true sources of contributions . . .  that were falsely attributed to conduit entities Grow United, the Center for Advancement of Integrity and Justice, Florida Promise, Broken Promises, and Stand Up for Justice."

212.    CREW's complaint, which only concerned five "federally registered super PACs" and only concerned the 2020 election cycle, alleged that $1.27 million had been improperly funneled through five nonprofits and tied Matrix and Pitts to the super PACs. CREW tracked contributions from the five Matrix controlled entities to federal super PACs involved in federal elections using public records.

213.    On March 31, 2020, Stand Up for Justice gave $50,000 to South Florida Residents. First, a super PAC supporting a single candidate for a U.S. House of Representatives seat in Florida. Stand Up for Justice was officially chaired by Pitts' longtime friend Anderson.

214.    On July 9, 2020, LPAD transferred $26,000 to Broken Promises, the entity nominally chaired by Pitts' longtime friend, Anderson, who also chaired other entities that Pitts assured FPL were "100percent" under Pitts' control. Broken Promises donated $20,000 to Concerned Conservatives, Inc., a super PAC supporting a single candidate for a U.S. House of Representatives seat in Florida, five days later, on July 14, 2020.

215.    On October 27, 2020, the Center for Advancement of Integrity and Justice contributed $100,000 to a super PAC supporting another U.S. House of Representatives seat in Florda American Valor PAC. This was the largest donation received by American Valor PAC, which spent $286,000 in total during the 2020 election cycle. Alexander registered the Center for Advancement of Integrity and Justice, but it was controlled by Odom and Matrix.

216.    According to the Securities Complaint, a ledger of contributions to the Senate Leadership Fund produced in response to a public records request filed by the Florida Center for Government Accountability with the Florida State Attorney's Office confirms that Florda Promise made a $1,000,000 contribution to the Senate Leadership Fund on December 8, 2020. FPL was the

ultimate source of the funds that were improperly funneled through intermediaries to Super PACs for the express purpose of concealing identify of FPL.

217.    To date, the "ghost candidate" scandal in multiple investigations, criminal prosecutions, and a conviction. Alex Rodriguez, the former Florida state legislature with longstanding ties to FPL, who ran in Florida State District 37, pled guilty to accepting two or more campaign contributions in excess of legal limits and related conspiracy charge. On September 30, 2024, a jury found Artiles guilty of three felony counts of campaign finance violations stemming from the scheme.

### E.    Silagy Used Matrix to Gain Control of a News Website to Attack FPL Competitors

218.    FPL and Matrix arranged for a Matrix-controlled entity to acquire control of a Florida-based news website called the *Capitolist*. FPL and Matrix then used the *Capitolist* to publish articles supporting FPL and NextEra-backed priorities, such as rate hikes and the acquisition of JEA, political opponents, and media outlets that report unfavorably on the Company.

219.    The *Capitolist* bills itself as a digital news website focusing on "Florida business, policy, and politics." It was founded in 2016 by Publisher and Editor-in-Chief Brian Burgess ("Burgess"). Burgess was beholden to Matrix and FPL regarding site content between at least 2018 and 2021. Articles posted on the *Capitolist* were pre-screened by Matrix personnel and frequently by FPL officers themselves, and a former FPL executive was formally brought in to oversee the site's content in September 2020.

220.    Silagy and Martell demanded that the *Capitolist* publish stories attacking specific reporters and political candidates running for office as early as 2018, implying that FPL was effectively spending money on political advertising related to specific elections, just as it had with

the mailers sent out in support of the ghost candidates. And, as with the ghost candidate schemes, FPL funded and ran the *Capitolist* covertly, using intermediary "straw" entities controlled by Matrix to conceal its own involvement. At one point, FPL even paid the salary the ex-FPL executive hired to manage the *Capitolist* through SUN Marketing.

221. According to the *Miami Herald*, on October 19, 2018, MacIver texted Martell a link to a *Capitolist* article critical of a proposal to allow utility customers to choose any electricity provider they wanted. The title of the article was: "Can you hear me now? Verizon hurricane troubles underscore danger of deregulating power companies." MacIver texted Martell asking if he wanted to have the title "changed from specifically mentioning power companies?" She later followed up" "Let me know if you're good." Martell replied: "I think it's ok." MacIver responded with a thumbs-up emoji and asked, "anywhere in particular you want me to target?"

222. According to the *Miami Herald*, on November 3, 2018, three days before the 2018 election, Martell texted MacIver asking for the *Capitolist* to publish a piece critical of a gubernatorial candidate, Andrew Gillium. Martell dictated that the article should state Gillum's campaigning has led him to neglect his duties as Mayor of Tallahassee. Martell suggested the following language: "Since the primary xxx shootings have happened in Tallahassee." Within three hours, the *Capitolist* published an article attacking Gillum. The second sentence of the article implied Gillum was responsible for "a crime wave of murders, robberies and shootings in Tallahassee."

223. FPL later evolved from sponsor to formal overseer of the *Capitolist* when, on September 20, 2019, MacIver executed a purchase option agreement with the *Capitolist* on behalf of Metis Group (the September 20, 2019, agreement amended an earlier version dated July 22, 2019). In exchange for $50,000, Metis Group gained "executive control" over the *Capitolist* and a

1% ownership stake. Metis Group also gained the option to buy a controlling 52% share in the *Capitolist* for $195,000 (minus the already paid $50,000). The purchase option agreement is attached to the Robo Memorandum.

224. According to the *Miami Herald*, on April 16, 2020, Pitts forwarded an email message from Burgess to Defendant Silagy's personal Yahoo account and Martell's personal Gmail account discussing an idea to buy additional news outlets "stealthily so we could inject content . . . and nobody needs to know who's pulling the strings[.]"

225. Likewise, according to the Securities Complaint, Tim Fitzpatrick ("Fitzpatrick"), a former FPL executive who worked directly under Silagy for several years, was hired to oversee the *Capitolist'*s day-to-day operations. Fitzpatrick also was designated as the official owner and manager of SUN Marketing when it was incorporated in December 2019.

226. According to a *Miami Herald* article titled: "Powerbrokers: How FPL secretly took over a Florida news site and used it to bash critics," published on July 25,2022, and updated August 13, 2022, after Fitzpatrick began overseeing the *Capitolist* in September 2020, "the number of headlines mentioning FPL and other energy-related topics more than doubled."

### *Media Outlets Begin Reporting FPL's Connection to the Ghost candidate Scheme*

227. On December 2, 2021, the *Orlando Sentinel* published an article titled "Florida Power & Light Execs Worked Closely with Consultants Behind 'Ghost' Candidate Scheme, Records Reveal." The article disclosed that the *Orlando Sentinel* obtained "checks, bank statements, emails, text messages, invoices, internal ledgers, and more" that were "apparently unearthed during an internal investigation" by Matrix. The article reported that documents showed that Matrix consultants billed FPL for more than $3 million shortly before they began moving the money through Grow United that funded the ghost candidate scheme. The article further reported

that the records also showed that Silagy coordinated with Matrix personnel on FPL campaign contributions that Matrix moved through various dark money non-profits – totaling more than $10 million.

228.    The *Orlando Sentinel* reported that Defendant Robo received the same records in November 2021.

229.    On December 30, 2021, the *Orlando Sentinel* published another article detailing the ghost candidate scheme. In the article, the *Orlando Sentinel* explained that its reporting was based on documents that had been delivered to the paper, including checks, bank statements, emails, text messages, invoices, ledgers, and other documents involving Matrix and FPL and covering the period between 2016 and 2020.

230.    Over the next eight months, Florida newspapers extensively covered this scandal and published over a dozen articles linking NextEra and FPL to the ghost candidate schemes, the *Capitolist*, and other improprieties. Those stories frequently drew on internal Matrix documents obtained by the press.

231.    On December 17, 2021, Defendant Reuter told the Orlando Sentinel that the Robo Memorandum was "shared with us" and that he and others were thus aware of the funding structure described in the memos sent to Silagy on November 26, 2019.

## FALSE AND MISLEADING STATEMENTS

232.    From at least December 2, 2021, through January 31, 2023, certain Defendants caused NextEra and FPL to make false and misleading statements and omissions as described above. The Individual Defendants' misstatements and omissions include: (1) affirmative misstatements denying or minimizing the role of NextEra and FPL in the improper conduct described above, and (2) misstatements or omissions in SEC filings that conceal the severe

negative repercussions NextEra and FPL endured as a consequence of the schemes perpetrated above.

233.    On December 2, 2021, in response to the *Orlando Sentinel*'s reporting on the ghost candidate scheme, Defendant Reuter denied the Company played any role in the misconduct:

> Neither FPL nor our employees provided funding, or asked any third party to provide funding on its behalf, to Grow United in support of Florida state-level political campaigns during the 2020 election cycle. Any report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false, and we have found absolutely no evidence of any legal wrongdoing by FPL or its employees.

234.    Likewise, on December 10, 2021, in response to questions by the *Orlando Sentinel* and the *Florida Times-Union* about the creation of Grow United, Defendant Reuter stated that "FPL had no involvement in the creation of Grow United," and further stated:

> Over this past summer, through both questioning from media and our own subsequent investigation, we learned that Joe Perkins' team was responsible for the origins of this non-profit. As we understand it, Mr. Perkins had another client based out of Denver who was advocating nationally for the legalization of marijuana. Grow United was created for that client, who expressed interest in setting up offices in Georgia, Florida and Alabama.

235.    On December 17, 2021, when asked by the *Orlando Sentinel* about the November 29, 2019, Funding Memo and Legal Memo that Pitts sent to Defendant Silagy proposing a structure for FPL's political campaign pending that would "minimize public reporting," Defendant Reuter said, "we have found no evidence that FPL or our employees used this proposal to support our communication and outreach activities during the 2020 election cycle[.]" Reuter further stated:

> Neither FPL nor Eric Silagy requested Matrix to set up any proposed funding structure for 501(c)(4) organizations and we had no knowledge of this structure being used by Matrix. We are aware of the proposed structure as the legal memo was shared with us, and as we understand it, Joe Perkins' team at Matrix created a proposal to fund their clients' communication and outreach activities during 2020.

236. On December 10, 2021, when asked about the job offer extended to Garrett Dennis, Defendant Reuter said:

> In July 2019, a Matrix representative working for Joe Perkins approached FPL about a plan to offer Garrett Dennis a job working to decriminalize marijuana. FPL flatly rejected the plan and communicated our lack of interest to Joe Perkins' team.

237. On January 25,2022, the Company held the "4th Quarter and Full Year 2021 Earnings Conference call." During the call, Defendant Robo was asked whether he had "any thoughts or comments [he'd] like to share around some of the headlines pertaining to FPL." Defendant Robo replied as follows:

> I think on some of the Florida political headlines, I think what I'd like to say on that is pretty simple. When . . . we received the report and those allegations that have been in the press, we conducted a very extensive and thorough investigation that included looking at company financial records, that include looking at everyone who was named in its company emails, also looking at their they've all provided access to their personal emails And text to us as part of that investigation. And the bottom line is we found no evidences of any issues at all, any illegality or any wrongdoing on the part of FPL or any of its employees. And so that's kind of the bottom line. And I feel very good about the investigation that we did and I feel very good that there is no basis for any of these allegations.

238. On June 24, 2022, when asked about the *Orlando Sentinel* and the *Florida Times-Union* about FPL's alleged covert monitoring of *Florida Times-Union* journalist Nate Monroe, Defendant Silagy responded in an interview with reporters, including Monroe, "[w]e did not engage in any activities having to do with following people like you, Nate, or taking pictures."

239. On that same day, the *Orlando Sentinel* presented Defendant Reuter with text messages and emails indicating that a private investigator paid by Matrix had followed Monroe while updating Martell on the pursuit, Defendant Reuter made a statement casting doubt on the authenticity of the record, saying FPL had "no digital record of these exchanges and cannot prove

their veracity" and "[t]aken individually or collectively, none of the information you have in your possession demonstrates any wrongdoing by FPL or our employees."

240. On August 13, 2022, the *Miami Herald* reported on FPL's apparent control over the *Capitolist*. Chris McGrath, who worked at the time as a spokesperson for FPL answered questions from the *Miami Herald* and stated: "FPL does not have an ownership interest in the Capitolist – either directly or indirectly. . . We also do not have editorial control over what the Capitolist writes or publishes."

241. On February 18, 2022, NextEra filed its Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating performance for the year ended December 31, 2021 ("2021 10-K"). The 2021 10-K was signed by Defendants Robo, Barrat, Camaren, Dunn, Gusahaney, Hachigian, Lane, Porges, Schupp, Skolds, Utter, and Wilson. The 2021 10-K also contained certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendant Robo and Rebecca Kujawa, NextEra's Executive Vice President of Finance, and Chief Financial Officer ("CFO") of NextEra. The 2021 10-K failed to disclose any risk to investors that NextEra might be negatively impacted by the investigations into allegations that FPL or NextEra had violated or abetted violations of federal, state, or local election laws.

242. On April 1, 2022, NextEra filed the 2022 Proxy Statement, which solicited shareholder votes in favor of, among other things, the reelection Defendants Robo, Barrat, Camaren, Dunn, Gursahaney, Hachigian, Lane, Porges, Robo, Schupp, Skolds, Stall, and Wilson (the "Proxy Defendants").

243. The 2022 Proxy Statement contains several representations in support of the reelection of the Proxy Defendants, including: (1) NextEra had adopted a Code of Business Conduct & Ethics applicable to all representatives of NextEra Energy and its subsidiaries,

including directors; (2) the "Board had instructed the General Counsel to assist the Board in reviewing all written communications" regarding, among other things, any internal and external complaints, including as they relate to Company subsidiaries, such as FPL; and (3) the Audit Committee oversees compliance with legal and regulatory requirements as well as "major risks" to the Company. The 2022 Proxy Statement further requested shareholders to ratify executive compensation awards, including Defendants Robo, Silagy, and Ketchum.

244.    The Individual Defendants caused the 2022 Proxy Statement, to omit the governance failures which already caused multiple instances of unlawful or unethical Company behavior, exposing NextEra to financial and reputational harm, and that the Board had insufficient policies and procedures to uncover and remedy such behavior.

245.    The 2022 Proxy Statement was also false and misleading because it failed to disclose that, despite making representations regarding the Board's risk oversight function and the Audit Committee's responsibilities, the Board and committees were not adequately exercising their roles and were causing or permitting the Company to issue false and misleading statements regarding the Robo Memorandum, the Company's response, and the resulting fallout therefrom.

246.    The false and misleading representations and omissions in the 2022 Proxy Statement were material for the shareholders' vote on the Board's proposals, particularly with respect to the reelection of incumbent directors and the approval of executive compensation.

247.    On April 22, 2022, NextEra filed its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating performance for the three-month period ending March 31, 2022 ("1Q22 10-Q"). The 1Q22 10-Q was certified by among others, Defendants Silagy and Ketchum. The 1Q22 10-Q also contained certifications made pursuant to SOX that were signed by Defendants Ketchum and Silagy, and CFO Terrell Kirk Crews II ("Crews"). The 1Q22 10-Q

failed to disclose any risk to investors that NextEra might be negatively impacted by investigations and allegations that FPL or the Company had violated or otherwise abetted violations of federal, state, or local election laws.

248.   On July 27, 2022, NextEra filed its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating performance for the three-month period ending June 30, 2022 ("2Q22 10-Q"). The 2Q22 10-Q was certified by among others, Defendants Silagy and Ketchum. The 2Q22 10-Q also contained certifications made pursuant to SOX that were signed by Defendants Ketchum and Silagy, and CFO Crews. The 2Q22 10-Q failed to disclose any risk to investors that NextEra might be negatively impacted by investigations and allegations that FPL or the Company had violated or otherwise abetted violations of federal, state, or local election laws.

249.   On November 3, 2022, NextEra filed its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating performance for the three-month period ending September 30, 2022 ("3Q22 10-Q"). The 3Q22 10-Q was certified by among others, Defendants Silagy and Ketchum. The 3Q22 10-Q also contained certifications made pursuant to SOX that were signed by Defendants Ketchum and Silagy and CFO Crews. The 3Q22 10-Q failed to disclose any risk to investors that NextEra might be negatively impacted by investigations and allegations that FPL or the Company had violated or otherwise abetted violations of federal, state, or local election laws.

**THE TRUTH EMERGES**

250.   On January 25, 2023, NextEra filed a Form 8-K with the SEC, which for the first time acknowledged that FPL faced legal and reputational risks because of the allegations that FPL executives may have engaged in political misconduct. The Form 8-K stated:

Allegations of violations of law by FPL or NEE have the potential to result in fines, penalties, or other sanctions or effects, as well as cause reputational damage for FPL and NEE, and could hamper FPL's and NEE's effectiveness in interacting with governmental authorities.

FPL's and NEE's business and reputation could be adversely affected by allegations that FPL or NEE has violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations. For example, media articles have been published that allege, among other things, Florida state and federal campaign finance law violations by FPL . . . FPL and NEE cannot guarantee that the FEC complaint process will not ultimately result in a finding that FPL or NEE violated federal campaign finance or other laws, that applicable federal or state governmental authorities may not investigate or take enforcement actions with respect to the allegations or assert that legal violations by FPL or NEE have occurred, or that violations may not ultimately be found by a court of competent jurisdiction or other authorities to have occurred.

In addition, notwithstanding the completion or pendency of any internal review or investigation by FPL or NEE of any allegations of legal violations, including of the allegations regarding campaign finance laws set forth in the media articles or FEC complaint, FPL and NEE cannot provide assurance that any of the foregoing will not result in the imposition of material fines, penalties, or otherwise result in other sanctions or effects on FPL or NEE, or will not have a material adverse impact on the reputation of NEE or FPL or on the effectiveness of their interactions with governmental regulators or other authorities.

251.    On the same day, NextEra filed a second Form 8-K disclosing that Silagy would no longer serve as CEO of FPL as of February 15, 2023, and would retire on May 15, 2023.

252.    In an exhibit attached to the Form 8-K, NextEra disclosed a "Confirmation of Post-Retirement Covenants Agreement" (the "Severance Agreement") between NextEra and Silagy, where Silagy agreed to, among other things, a release of claims and various restrictive covenants, in exchange for payments in the form of incentive awards calculated in accordance with NextEra's annual incentive plan and equity awards, which was characterized as a "normal retirement" of an employee at least age 55 after 10 years of service.

253.    The Severance Agreement provided no clawback provisions for anything less than felony culpability by Silagy. Civil liability, including breaches of federal securities laws, or breaches of the Company's ethical standards are not actionable under the Severance Agreement.

254.    Stock market analyst Paul Patterson of Glenrock Associates wrote the Company's stock price decline on January 25, 2021, was "driven substantially by the unexpected management change and the update they gave on their review into political activity." On January 27, 2023, the South Florida Sun Sentinel reported on the 8-K's discussion of the FEC Complaint, writing that it "was a tacit admission that $1.3 million from FPL went into the dark money pipeline."

255.    On December 1, 2021 — one day before the initial report on the Robo Memorandum was published — Defendant Silagy sold 62,480 shares of personally held NextEra stock at $87 per share, representing a total value of $5,435,760. Silagy knew that a negative news story linking FPL to Matrix and the "ghost candidate" scandal was imminent since he was asked to provide quotes in response to specific questions about the content of the story. These 62,480 shares of NextEra stock sold by Defendant Silagy were the single largest volume of shares sold in a single day of trading through his whole tenure as an officer of FPL, since 2012.

256.    On September 29, 2023, the General Counsel for the FEC submitted their factual and legal analysis of the FEC Complaint in an initial 48-page report to the Commission (the "General Counsel Report"). In the report, the General Counsel did not recommend taking action against FPL at that time, based partially on Defendant Silagy's sworn statement that FPL did not use any FPL funds to make conduit contributions through nonprofit organizations in 2020.[9]

_____

[9] FED, First General Counsel's Report (Sept. 29, 2023), https://www.fec.gov/files/legal/murs/8082/8082_51.pdf, at 41-42.

257.    However, the General Counsel noted that Defendant Silagy's sworn statement was limited to 2020 and did no reach the alleged payments to nonprofits by FPL in the 2018 cycle. The report found that FPL appeared to have founded the groups prior to 2020, may have been one of the sources of the relevant contributions, and that FPL implemented at least part of Matrix's proposed scheme.

258.    On February 8, 2024, the FEC failed on a 2-3 vote (with one absence) to accept the General Counsel's recommendations. On February 27, 2024, the FEC failed on a 3-3 vote to dismiss the FEC Complaint, voting to close the file. NextEra and FPL narrowly escaped a full-blown investigation from the FEC, and the extensive analysis of the General Counsel Report showed that FPL's participation in the scheme was credible.

## REPURCHASES DURING THE RELEVANT PERIOD

259.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $19.3 million to repurchase approximately 253,736 shares of its own common stock at artificially inflated prices from December 2021 through December 2022.

| Dates of Stock Re-purchase | Numbers of Shares Repurchased | Average Price Per Share on Date of Repurchase | Cost of Repurchase |
|---|---|---|---|
| December 1,2021 to December 31, 2022 | 1,306 | $90.78 | $118,558.68 |
| February 1, 2022, to February 28, 2022 | 222,996 | $75.38 | $16,809,438.48 |
| March 1, 2022, to March 31, 2022 | 1,618 | $81.22 | $131,413.96 |
| May 1, 2022, to May 31, 2022 | 8,056 | $69.80 | $562,308.80 |
| June 1, 2022, to June 30, 2022 | 1,804 | $73.20 | $132,052.80 |

| July 1, 2022, to July 31, 2022 | 164 | $80.25 | $13,161.00 |
|---|---|---|---|
| August 1, 2022, to August 31, 2022 | 7,870 | $91.00 | $716,170.00 |
| September 1, 2022, to September 31, 2022 | 1,554 | $85.50 | $132,867.00 |
| November 1, 2022, to November 31, 2022 | 6,819 | $82.91 | $565,363.00 |
| December 1, 2022, to December 31, 2022 | 1,549 | $86.21 | $133,539.29 |
| **Total** | **253,736** | | **$19,314,873.30** |

## DAMAGES TO NEXTERA

260.    As a direct and proximate result of the Individual Defendants' misconduct, NextEra has expended and will continue to expend significant sums of money.

261.    Such expenditures include, but are not limited to, legal fees, costs, and amounts paid to outside lawyers, accountants, experts, and investigators in the Securities Class Action.

262.    Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

263.    As a direct and proximate result of the Individual Defendants' conduct, NextEra has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

66

264. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

265. NextEra is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

266. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

267. Plaintiff is an owner of NextEra stock and has been a continuous holder of the Company's common shares at all relevant times.

268. A pre-suit demand on the Board is futile and therefore, excused. At the time this suit was filed, the Board consisted of the following twelve individuals: Defendants Arnaboldi, Camaren, Gursahaney, Hachigian, Ketchum, Lane, Porges, Stall, and Wilson (the "Director Defendants"). The Board also consisted of non-party directors Henry, Stahlkopf, and Martha. Plaintiff is required to show that a majority of directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, none of the Board's current directors are capable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

269. Each of the Director Defendants faces a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial

67

positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

270. The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

271. The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

**A. Defendants Arnaboldi, Gursahaney, and Wilson are Not Disinterested Because They Were Members of the Audit Committee.**

272. Defendants Arnaboldi, Gursahaney, and Wilson either serve, or have served during the Relevant Period, as members of the Audit and Finance Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent or correct the issuance of material misstatements and omissions regarding material deficiencies in the Company's

accounting practices as alleged above. Therefore, Defendants Arnaboldi, Gursahaney, and Wilson cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

### B.   The Director Defendants are Not Independent.

273.   The Director Defendants received, and most continue to receive substantial compensation for their roles as Company directors. In addition, Defendants solicited the false and misleading 2022 Proxy Statement, which led to their reelection to the Board, allowing them to continue breaching their fiduciary duties to the Company. As trusted Company directors, they conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For these reasons, Defendants Camaren, Gursahaney, Hachigian, Ketchum, Lane, Porges, Stall, and Wilson breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

274.   Furthermore, the Director Defendants signed the 2021 10-K and solicited the 2022 Proxy Statement, each of which contained false and misleading statements. As trusted Company directors, they conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded their duties to protect corporate assets. For these reasons, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested and, thus, demand upon them is futile and, therefore, excused.

275.   The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

69

intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

276.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

277.     The Director Defendants may be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of NextEra. If there is a liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of NextEra, there would be no insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought

derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

278.    If there is no liability insurance, then the Director Defendants will not cause NextEra to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

279.    Accordingly, for all the reasons set forth above, a majority of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT ONE

### Against the Proxy Defendants for Violations of Section 14(a) of the Exchange Act

280.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

281.    The Proxy Defendants solicited the 2022 Proxy Statement containing materially false and misleading statements and/or omissions.

282.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

283.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a- 9.

284.     The 2022 Proxy Statement failed to disclose: (i) deficiencies in NextEra's internal and disclosure controls that were known to the Proxy Defendants when the 2022 Proxy Statement was filed; and (ii) reporting failures known to the Proxy Defendants when the 2022 Proxy Statement was filed including Defendant Silagy's involvement with Matrix and FPL's role in the ongoing political scandals.

285.     In exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination.

286.     The Company was damaged as a result of the Proxy Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

287.     Plaintiff on behalf of NextEra has no adequate remedy at law.

## COUNT TWO

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

288.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

289. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding NextEra. Not only is NextEra now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in the Securities Class Action, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon NextEra by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging NextEra.

290. During the Relevant Period, the Individual Defendants caused the company to spend approximately $19.3 million to repurchase roughly 253,736 shares.

291. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

292. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about NextEra not misleading.

293. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and

did control the conduct complained of herein and the content of the public statements disseminated by NextEra.

294.     The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

295.     In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

296.     By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

297.     Plaintiff on behalf of NextEra has no adequate remedy at law.

### <u>COUNT THREE</u>

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act 15 U.S.C. § 78t(a)**

298.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

299.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase NextEra stock at prices artificially inflated by those materially false and misleading statements.

300.     Plaintiff, on behalf of NextEra, has no adequate remedy at law.

## COUNT FOUR

### Against the Individual Defendants for Breach of Fiduciary Duties

301.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

302.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of NextEra's business and affairs.

303.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

304.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of NextEra.

305.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

306.     In further breach of their fiduciary duties owed to NextEra, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (i) The Company's own

policies with respect to anti-competitive behavior and participation in the political processes were routinely flouted during the Relevant Period; (ii) The Company's reporting systems were not adequately designed to detect unlawful interference with the NECEC project, detect the unethical funding of nonprofits with Company money; (iii) no steps were being taken to remedy the discovered misconduct; and (iv) issuing false and misleading statements to stockholders.

307.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

308.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

309.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed

knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

310. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

311. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, NextEra has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

312. Plaintiff on behalf of NextEra has no adequate remedy at law.

## COUNT FIVE

### Against the Individual Defendants for Waste of Corporate Assets

313. Plaintiff incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

314. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

315. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (1) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed, *supra*; (2) awarding self-interested stock options to certain officers and directors; and (3) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

316.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

317.    Plaintiff, on behalf NextEra, has no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants, jointly and severally, and in favor of the Company, all losses and damages sustained by the Company as a result of the acts and transactions complained of herein, together with pre-judgment interest, in a fashion that ensures the Individual Defendants do not participate therein or benefit thereby;

C.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon;

D.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.    Awarding punitive damages;

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 3, 2026                                    **THE ROSEN LAW FIRM, P.A.**

                                                        */s/ Laurence M. Rosen*
                                                        Laurence M. Rosen
                                                        275 Madison Avenue, 40th Floor
                                                        New York, NY 10016
                                                        Telephone: (212) 686-1060
                                                        Fax: (212) 202-3827
                                                        Email: lrosen@rosenlegal.com

                                                        *Counsel for Plaintiff*